NATIONAL SHOE & LEATHER BANK OF AUBURN, and others,
*v.* SMALL, Assignee, etc., and others.

*(District Court, D. Maine.* June, 1881.)

1. NEGOTIABLE PAPER—HOLDERS—SUBROGATION — INDORSERS — CHAT-
   TEL MORTGAGE—INSOLVENCY.

   Where the makers and indorsers of negotiable paper are insolvent,
   the holders thereof may, upon the principle of subrogation, avail
   themselves of the rights of such indorsers arising under a chattel
   mortgage given them by the makers to secure them against loss
   because of their liability as indorsers.

2. CHATTED MORTGAGE OF AFTER-ACQUIRED PROPERTY—MORTGAGEES
   —GENERAL CREDITORS.

   In equity the right of mortgagees in after-acquired property under
   a chattel mortgage covering such property, as well as stock in hand, is
   superior to that of general creditors of the insolvent mortgagors.

3. SAME—NEGLECTING TO RECORD BEFORE THE INSOLVENCY OF THE
   MORTGAGORS.

   This right is not defeated by the neglect of the mortgagees to record
   their mortgage before the mortgagors became insolvent.

In Equity.

*Webb & Haskell,* for plaintiffs.

*Wm. L. Putnam,* for defendants.

Fox, D. J. This bill is instituted by two national banks
located in Androscoggin county, in this district, against L.
L. Small, the assignee, under the insolvent law of this state,
of the estates of Joshua M. and Mary A. Wagg, and Nathan-
iel I. Jordan, assignee of Samuel P. Irving and Hartwell K.
Wagg, copartners in the shoe business at Auburn, under the
style of Irving & Wagg, praying to be subrogated to the
rights of Joshua M. and Mary A. Wagg under a certain
chattel mortgage made and executed to them by Irving &
Wagg on the tenth of July, A. D. 1879, to secure said Joshua
M. and Mary A. Wagg the payment of certain sums loaned
by them to Irving & Wagg, and also to save them harmless
from all liability on account of any indorsements made or to
be made by them for the benefit of said Irving & Wagg; the
complainants having afterwards discounted for Irving &

Wagg their notes, indorsed by Joshua M. and Mary A. Wagg, upon which they are chargeable as joint promisors, and which are overdue and unpaid. The holders of certain other notes of Irving & Wagg, upon which Joshua M. and Mary A. Wagg are liable as indorsers, are also made parties defendant to this proceeding.

The assignee of Irving & Wagg appears, and in his answer admits—

That the claimants are the holders of the "paper of Irving & Wagg, as set forth in their bill; that a mortgage was made by them to Joshua M. and Mary A. Wagg, but that said mortgage was not recorded until August, 1881, and that at the time of its execution [as he alleges] it was fraudulently agreed by the parties to said mortgage that, notwithstanding said mortgage was to be given as aforesaid, it should be held secret, and should not be recorded; that Irving & Wagg might nevertheless continue manufacturing and purchasing on credit to be obtained from parties who would be ignorant of the existence of said mortgage, and who would rely on said property as unencumbered for the payment of the debts to be so contracted, and that in the event said Irving & Wagg should at any future time become insolvent, said mortgage should be put upon record, and said future creditors thus deprived of the means of obtaining payment of their several debts; that in pursuance of this fraudulent agreement the mortgage was kept secret, and Irving & Wagg continued in business, purchasing on credit from parties who gave credit to them mainly on the fact that their property was unencumbered property."

It appears that Irving & Wagg failed July 12, 1880, owing nearly $20,000, the most, if not all, of which debts were incurred subsequent to the giving of the mortgage. The mortgage purports to convey all the stock,—

"Raw or in process of manufacture, now in their shop, with all the machinery and furniture, and other personal property of whatever description, belonging to the mortgagees, now in their shop; also all stock and materials now on hand, or which may be hereafter purchased by us and put into said shop for the purpose of being manufactured into boots and shoes."

The condition of the mortgage is—

"That if said Irving & Wagg shall well and truly indemnify and save harmless said Joshua M. and Mary A. Wagg from and against any and all liability to which they or either of them may be subjected by reason of having indorsed a certain promissory note of even date herewith, given by said Irving & Wagg to John W. May, for the sum of $600, payable in one year, with interest semi-annually at 7 per cent., and shall

also pay to said Joshua M. and Mary A. Wagg, or to either of them, any and all moneys which they, or either of them, may hereafter loan to said firm, and shall also save them harmless from liability on any note or notes hereafter indorsed by them for the benefit of said firm, and shall keep said property insured in the sum of at least $2,000, for the benefit of said Joshua M. and Mary A. Wagg, then this bill of sale should be void."

May is one of the defendants, and so is James S. Jordan, who subsequently loaned $1,000 to Irving & Wagg on their notes, indorsed by Joshua M. and Mary A. Wagg.

It is shown that Irving & Wagg commenced business in May, 1879, with a capital only of some $700, borrowed of Joshua M. Wagg by his son, Hartwell, who was a member of the firm. In July, the firm being in need of money, Hartwell K. Wagg applied to John W. May for a loan of $600, proposing to give the note of the firm, indorsed by his father and mother, saying that he intended to secure them for this and any other liabilities they might afterwards incur by a mortgage of the firm property. Hartwell soon after informed his father what he proposed doing, and that he would give him the contemplated security, which should also cover about $900 previously loaned by the father. The father assented to the arrangements, and when spoken to by May about it, told him "to make it all right so as to secure them," authorizing him to take the mortgage and keep it for him till he called for it. May thereupon made the $600 loan to the firm, taking their note, indorsed by Joshua M. and Mary A. Wagg. This mortgage was signed by Irving & Wagg, in the presence of May, and witnessed by him. From all the testimony I am satisfied that, at that time, the mortgagors expected that the mortgage would not be immediately recorded; but as it would injure their credit, and they then hoped to continue in business, they intended it should be on that account withheld from the record for the time being, and were to be informed when it was placed on record.

Irving's testimony is "that Hartwell Wagg agreed with him, at the time he signed the mortgage, that the mortgage should not then go on record, as it would affect their credit, and that he should be informed when it should be put

on record." Hartwell Wagg, in his examination, also states "it was kept from record until August, 1880, to help the credit of Irving & Wagg." There can be no doubt, therefore, that the mortgagors expected that the mortgage would not be recorded immediately, and were apprehensive of serious consequences to their credit if it should be done. Whatever might have been the expectations of the mortgagors in this behalf, and however fraudulent may have been their purpose and design, the rights of the mortgagees—there having been a complete execution and delivery of the instrument by its makers to May, for the benefit of the mortgagees, and having subsequently incurred liabilities as indorsers, within the condition of the mortgage, to the amount of near $4,000—are not to be impaired by fraudulent purposes of the mortgagors, unless the mortgagees in some way became parties thereto and assented to such fraudulent purpose. This is most positively and directly denied by both of the mortgagees, who assert that nothing was ever said, by either of them, about withholding the mortgage from record; that they never made any such agreement with either Irving or Wagg, and never had any such understanding, but were at full liberty to record the same at any moment; and in this respect these statements are corroborated by the testimony of May, who declares that he never made any such agreement, and that, at the time the mortgage was executed and delivered to him by the mortgagors, there was nothing said about not recording it; that after the instrument was completed, in a day or two, he informed Joshua M. Wagg he held the paper for him, and his impression is that he told him it should be recorded, to which Joshua made answer for him to keep it, and he would call for it.

It is claimed that if it should be conceded that the mortgagees were not personally parties to an agreement not to record the mortgage, that they are still to be held chargeable by reason of the arrangement to this effect between the mortgagors thereby to sustain their credit and defraud sub-

sequent creditors; that Hartwell was the agent of the mortgagors in procuring the mortgage from the firm, and that whatever fraud was contemplated by the firm, and whatever was done by them in accomplishing it, must be held committed by their agent in obtaining the mortgage, and is as fatal to their rights as if they themselves had personally participated in the transaction. The evidence, however, fails to establish any such agency or authority of Hartwell thus to act in behalf of his parents. It does not appear that he had authority in their behalf to procure the mortgage and enter into any agreement or understanding that they would withhold the mortgage from record. When he applied to May for the loan of $600, he told him he would procure the indorsement of his parents, and would secure them for this and any other liabilities they might incur for the firm, and he afterwards so informed his father. But May, and not Hartwell Wagg, was the agent of the mortgagees to receive delivery of the mortgage, and he was expressly instructed by Joshua M. Wagg "to make it all right so as to secure them," and was further directed "to take the mortgage and keep it for him;" and May says the mortgage was executed and delivered to him by the mortgagors, nothing being said about its being kept from registry. The mortgage, therefore, was a complete and perfect instrument, which the mortgagees could record at any moment that they deemed it for their interest so to do. Such are the averments in the answers, and they are fully sustained by the weight of the evidence. Some circumstances are relied upon as in conflict with the answers, but they are of little moment, and should have no effect to control the sworn statements of the mortgagees found in their answers to the bill, and their testimony as witnesses. The charge, therefore, in the bill, that there was an agreement that the mortgage should be withheld from record and kept secret, and thereby a fraudulent credit obtained for the mortgagors, is not sustained by the testimony, and the case is simply one where a party has negligently failed to record his mortgage until his debtors had

become insolvent, and falls within the principle sactioned by the United States supreme court in *Sawyer* v. *Turpin*, 91 U. S. 121.

It is urged that if the court is not satisfied that there was an agreement by the parties thereto to withhold the mortgage from record, still in fact the result has been to give the mortgagors a false credit,—to hold them out, to those who were dealing with them, as being the absolute owners of their shop without incumbrance,—and that injustice will result to those who had since dealt with them on credit if the property is allowed to pass under the mortgage, and is not distributed equally among all the firm creditors; that the leading rule in equity is that a party who asks equity must do equity; and as by the decisions in this state after-acquired personal property does not at law pass under a mortgage, although such may be its purport, and these complainants are compelled to come into equity for relief, they should not be allowed to appropriate the stock purchased since the mortgage, but the same in justice and equity ought to be distributed *pro rata* among all the creditors. But a complete answer to this view is that the mortgagees, not having had any fraudulent intent in not recording their mortgage, the assignee in insolvency of the mortgagors acquired no greater equity than the insolvents had after giving the mortgage; and having expressly stipulated by their mortgage that any property they should afterwards acquire should pass to the mortgagees, and be held by them as security, the mortgagees thereby acquired a greater equity to appropriate such after-acquired property to their security, if occasion should arise, than the general creditors who were without contract for any security.

Fraud not being established, the case must be governed by *Mitchell* v. *Winslow*, 2 Story, and the mortgagees must be held to have acquired, by the terms of their mortgage, a better right to the after-acquired property than the general creditors of the insolvent, and of this security the holders of the paper from liability on which the mortgage was intended

as a protection, when the makers and indorsers are insolvent, can avail themselves upon the principle of subrogation, as was decided by this court in *Matthews* v. *Abbott*, November, 1878.

Decree for complainant.